**STATE of Missouri, Plaintiff–Respondent,**

v.

**Justin M. BROWN, Defendant–Appellant.**

No. 27911.

Missouri Court of Appeals, Southern District, Division Two.

Jan. 3, 2008.

Motion for Rehearing or Transfer Denied Jan. 24, 2008.

has been reassigned to this court as a special judge for the purpose of disposition of this case.

Janet M. Thompson, Columbia, MO, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Roger W. Johnson, Jefferson City, MO, for respondent.

NANCY STEFFEN RAHMEYER, Judge.

Justin M. Brown ("Appellant") was found guilty by a jury of first-degree murder in violation of section 565.020 and one count of kidnapping in violation of section 565.110.[1] Appellant waived jury sentencing for the kidnapping charge. The State sought the death penalty for the murder charge; however, the jury assessed punishment as life imprisonment without parole. The trial court sentenced Appellant to consecutive terms of imprisonment for life without parole for first-degree murder and fifteen years for kidnapping. Appellant brings five points on appeal alleging error during jury selection, error in the verdict director, a constitutional violation and prosecutorial misconduct. We find no error and affirm the rulings of the trial court.

Appellant does not challenge the sufficiency of the evidence. We, therefore, view the evidence in a light most favorable

---

1. All references to statutes are to RSMo 2000, unless otherwise specified.

to the verdict. *State v. Johnson*, 95 S.W.3d 221, 222 (Mo.App. S.D.2003).

Ralph Lape ("Victim") was retired from the Frisco Railroad and had received a lump-sum disability settlement from the railroad in 1997. In 2002, he held a money market account with approximately $117,000 in it and a checking account with approximately $15,000 to $20,000 in it. Victim had been divorced for several years and was living alone on several acres in a modular home. He was selling the property and expecting to close on July 26, 2002. The property had a large garage with a camper inside. A friend of Victim arranged for Mark Gill, who was having money troubles, to live inside that camper. Victim also co-owned a cabin on a lake in Kentucky where he spent the July 4, 2002 holiday weekend with some friends. The holiday weekend ended on July 7, 2002, and Victim's friends and family did not see him after that date.

After the holiday weekend, Mary Cates, the wife of the other co-owner of the Kentucky property, noticed that Victim had stopped returning her phone calls, so she contacted Victim's sister, Diane Miller. Cates also spoke to Gill about whether he had seen Victim since the July 4 weekend. Gill told Cates that Victim had returned on Sunday but left the following morning. Gill attempted to return the keys to Victim's house, but Cates suggested he should stay so there was someone at the house in case Victim tried to contact Gill.

On July 22, 2002, after Victim's friends and family had noticed that Victim was still absent and not returning phone calls, Victim's daughter, Megan, and his ex-wife went to Victim's house. After knocking several times, Gill answered the door and Megan could see Appellant sitting on the couch drinking a beer. Gill told Megan and Victim's ex-wife that Victim had gone to Kentucky Lake and had hired Gill and Appellant to move his belongings because he was selling the house. Before Megan left, she noticed that the kitchen and bathroom were filthy and that there was mud and ash in the bathroom tub. This was unusual to Megan because Victim was usually very neat and clean.

On July 23, 2002, Victim's brother-in-law, Mitch, went to Victim's house. When Mitch arrived he saw Gill and Appellant standing at a burn barrel near the back of the property. Mitch noticed the house had been cleaned, except for some mud and ash residue in the bathtub. Mitch also noticed that Victim's .357 magnum single action revolver and a single action .22 revolver were missing from Victim's gun cabinet and bedroom.

When Victim did not return, Diane decided to report him missing the day before the scheduled closing on Victim's house. Diane also began collecting Victim's mail. This led Victim's family and the police to become aware that Victim's ATM card was being used. Video of the ATM withdraws showed that Gill had been using Victim's credit card. Credit card and bank statements showed that Victim's internet banking service was used to transfer $55,000 from his money market account to his checking account, and there had been ATM withdrawals made in Illinois, Kansas, Arizona, Wyoming, Colorado, Utah, Nevada, and New Mexico. Gill was arrested on July 30, 2002, not far from a New Mexico gas station, driving his girlfriend's car. Police found Victim's ATM card as well as $400 in cash. Police also found .357 magnum rounds in the car and a .357 revolver wrapped in a white t-shirt and hidden in the jack assembly compartment in the trunk.

Also on July 30, 2002, police interviewed Appellant by phone. Appellant said that he had not heard from Gill since Tuesday or Wednesday of the previous week when

he was helping Gill move items from Victim's garage. Appellant said that he had never met Victim. Later that day, police interviewed Appellant again at his girlfriend's house. Appellant detailed his relationship with Gill and stated that the last time he saw Gill was July 25, 2002.

Appellant was interviewed at the police station on July 31, 2002. After waiving his *Miranda*[2] rights, Appellant told police that he had gone to visit his mother in Portageville on July 4, 2002, and spent all of July 5, 2002, with his girlfriend. Appellant said that he and a friend went to visit Gill at Victim's home on July 6, 2002, and that Gill came to Appellant's house on July 7, 2002, to ask if Appellant wanted to go to St. Louis. Appellant told Gill that he did not have any money, but Gill told Appellant that he would cover him. On the way to St. Louis, Gill gave Appellant an ATM card and a PIN and had Appellant get cash from an ATM at a convenience store in Herculaneum, Missouri. Appellant and Gill then went to a strip club in East St. Louis, Illinois, and then stayed at the Adams Mark Hotel. Gill tried to buy shoes at the mall using Victim's card, but he was not able to because he did not have photo identification. After the interview, the investigators allowed Appellant to leave.

The next day, August 1, 2002, investigators interviewed Appellant again and administered a polygraph examination. The investigator was told Appellant was a suspect in using Victim's ATM card and possibly involved in disposing of Victim's body; the investigator drafted questions for Appellant that addressed those issues. Appellant admitted that he had lied to the investigators the day before. At that time, one of the investigators told Appellant that if he was truthful and all he did was help dispose of a body, there was a good chance

the prosecutor would be willing to work with him regarding the charges. Appellant wanted to talk to the prosecuting attorney, however, the investigators said they would need some information to show that Appellant knew more than what he had already shared. Appellant told the investigators they should stop looking for Victim's body in Kentucky Lake. The investigators called the prosecuting attorney, who made an agreement with Appellant to only charge him with misdemeanor tampering with evidence if Appellant "[was] not involved in the killing," provided a complete statement as to everything Appellant knew about the murder, and helped the officers find Victim's body and his truck.

After signing the agreement, Appellant directed investigators to a cornfield in Portageville, Missouri, where Appellant said Victim was buried. Appellant also directed investigators to East Cape Rock Park along the Mississippi River where Appellant said Gill had thrown the pistol in the river. When they returned to the police station, Appellant made a videotaped statement. In the statement, Appellant said that Gill had come over to his apartment and said he needed help getting rid of a body. Appellant said Gill bound Victim and put him in Victim's truck. Appellant rode with Gill and Victim to the cornfield and Appellant said he saw Victim breathing while they were on the drive. When they arrived at the cornfield, Gill made Appellant start digging and then Gill threw Victim in the hole and shot him once in the head. Appellant stated that afterward, Gill dropped him off at home and the next day they went to St. Louis.

Appellant made a second videotaped statement on August 2, 2002. In the second statement, Appellant admitted that he

2. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

had not told the entire truth in the previous video statement. Appellant added that both he and Gill were having money troubles. Gill came to Appellant and said he wanted him to tape Victim up, take him out to the country, and shoot him. Appellant admits that he went to the store to purchase the duct tape used in the crime and that he helped bind Victim with zip ties. Before covering Victim's mouth with duct tape, Gill grabbed Victim and got his ATM PIN. Afterward, they took Victim out to the country, they both dug a hole, Gill put Victim in the hole, and Gill shot Victim once in the head.

Victim's body was recovered on August 1, 2002, in the location Appellant had directed them to. The cause of death, a small caliber gunshot wound to the head, confirmed the statements made by Appellant. Victim also had contusions to the scalp, trauma to the right jaw area, a skull fracture near the back of the head, a fractured rib, and bruising over a large part of his chest; those injuries were not caused by the gunshot.

## POINT I

 Appellant contends in his first point that the trial court erred in overruling his *Batson* objections to two venirewomen who were struck by the State; he further avers that the State used eight of its nine peremptory strikes against women and failed to strike similarly-situated veniremen.[3] A defendant can establish a *prima facie* case of discriminatory jury selection by "the totality of the relevant facts"

of the prosecutor's behavior during the defendant's trial. *Batson v. Kentucky,* 476 U.S. 79, 93–94, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The Missouri Supreme Court set forth a three-part procedure to determine whether a *Batson* violation occurred. *State v. Parker,* 836 S.W.2d 930, 939 (Mo. banc 1992). First, a defendant must challenge one or more specific venirepersons struck by the State and identify the cognizable protected class to which they belong; second, the State must provide a nondiscriminatory reason amounting to more than an unsubstantiated denial of discriminatory purpose; and third, the defendant must show that the State's explanation was merely pretextual and the true reason for the strike was racial.[4] *Id.* A trial court's ruling in a *Batson* challenge is "entitled to great deference on appeal" and will be reversed only if "clearly erroneous" leaving "the definite and firm impression that a mistake was made." *State v. Cole,* 71 S.W.3d 163, 172 (Mo. banc 2002). Because weighing the legitimacy of the State's explanation for a peremptory strike is, by nature, a subjective exercise, "we place great reliance in the trial court's judgment." *State v. Morrow,* 968 S.W.2d 100, 114 (Mo. banc 1998).

 Appellant first argues that the trial court erred in overruling his objection to the State's peremptory strike of venirewoman Cheryl Stapleton, who was struck by the State because "she could not be the foreperson to sign a death verdict form. She had written that the death penalty was only appropriate in the most extreme

---

**3.** Appellant has a separate complaint in his first point, which appears to challenge the court's denial of an overnight recess to enable defense counsel to ensure all the issues presented by the challenges were covered and to demonstrate their pretextual nature; however, we see no merit to his claim in that the trial court allowed defense counsel to supplement the record after a weekend of reviewing

the record and prior to the trial. Thus, we decline to review any claim concerning the denial of a recess.

**4.** *Batson* has been extended to prohibit peremptory strikes on the basis of gender. *State v. Williams,* 24 S.W.3d 101, 120 (Mo.App. W.D.2000).

cases on her jury questionnaire, and she had indicated in the verbal discussion at the Bench yesterday that she has been on antidepressants in the past." Appellant argued that similarly—situated male venirepersons were not struck and that several men who actually served on the jury demonstrated responses like Stapleton's. Because the State was seeking the death penalty, we shall address Appellant's contention that the strikes were pretextual because similarly situated males had similar views on the death penalty.

Appellant argues that one such male juror, Norris McHeffey, required a hearing aid to participate in the process and had stated in his juror questionnaire that the death penalty was appropriate "if proven guilty." Likewise, Appellant contends that James Robert Adams stated that whether he could impose the death penalty would depend on the facts of the case. He could impose death "If I believed beyond a shadow of a doubt he deserved it, I would have to choose so." Appellant claims that three other jurors, John Wolf, Todd Faubion, and Raymond Jennings, had similar concerns about the death penalty. Wolf's response in the questionnaire was "I am not against it, but I'm not for it. Everyone should be punished for their crime. The more severe crime, the more severe punishment." Faubion stated, "I believe that the death penalty is of course the most highest [sic] punishment. It is a penalty that needs to be taken seriously were [sic] only a few trials should even be considered with this punishment. There are some crimes that are com[m]itted that might need the strongest form of punishment." He stated, "[t]he death penalty is the most strongest [sic] sentence & I feel it would take something very bad to vote for it but if I felt it were appropriate I

would vote for it." Jennings stated that the death penalty "should apply for some but not for all."

We find all of the statements of the venirepersons to be thoughtful, honest, and insightful about their feelings toward the imposition of the death penalty. It is hardly surprising that each felt that the imposition of the death penalty required serious deliberation for a serious crime about a defendant that each felt was certain had committed that crime. We should expect no less from our jurors. The difference between the responses listed above and Stapleton's response was that even given the very serious and extreme situations in which the death penalty might be appropriate, on a personal basis she could not be the foreperson to sign a death verdict. That may have signaled to the prosecutor more than a conscientious effort to seriously deliberate the imposition of the death penalty in this particular matter. That alone might not differentiate Stapleton from the other venirepersons but when added to the State's given reason that Stapleton had been on antidepressants in the past and the fact that he had worked on a case where a juror had a "mental episode" during the trial, we find the State proffered a reasonable and gender-neutral ground for striking Stapleton.[5]

■ The second venireperson who Appellant claims was stricken for improper motives was Adrienne Cooker. She stated that while in the military she had attended special training in "Sexual Assault Victim Advocacy." She also stated that both the death penalty and life in prison should be carefully considered as potential punishments but her views on the death penalty would not prevent or substantially impair her ability to impose that sentence. She

5. In doing so, we reject Appellant's claim that a venireperson with a hearing aid is similarly situated to a venireperson with "nervousness" during the trial and past mental health issues.

would seriously consider imposing a death sentence, after looking at the facts and the law. Since behavior patterns are important, if a person lacked a history of violence, she would be more likely to lean toward a life sentence.

Appellant claims the State struck Cooker because of her questionnaire responses, because "she had been a sexual assault victim and, [because] although she believed the death penalty was necessary in some cases, if the defendant had no history of violence, she would lean toward life." Appellant mistakenly argues that the State's strike of Cooker was pretextual because Cooker was not the victim of sexual assault as the State had argued; she had only received sexual assault training. As the State notes, Cooker told the judge and both attorneys at a bench conference during voir dire that she had been sexually assaulted seven years before trial. While lack of support from the record may indicate pretext, that is not the case here.

Furthermore, the State actually argued that being the victim of a sexual assault would normally make her a good juror for the State, but because Appellant did not have a history of violence, the prosecutor believed her response to the questionnaire indicated venirewoman Cooker would have a problem imposing the death penalty in that case. The prosecutor articulated a reasonable, gender-neutral justification for striking Cooker. Given the totality of the circumstances—that this was a murder case involving a crime against a man by a man, that there were no real issues tied to gender, and the jury ultimately rejected the death penalty—we find the trial court did not err in denying Appellant's claim that Stapleton and Cooker were improperly stricken because of their gender. Point I is denied.

## POINT II

■ Appellant avers in his second point that his statements made to the police after a deal was entered into with the prosecutor should have been suppressed at trial because of the "promise of leniency" by the prosecutor. The letter from the prosecutor on which Appellant claims to have relied is as follows:

Dear Mr. Brown:

I am writing to confirm the promises I made to you over the telephone a few minutes ago. I would like for Detective Don Perry to read this letter aloud to you and for both of you to sign it when he is finished reading it. You may keep a copy of the letter.

My understanding from talking with the investigators is that you were not involved in the killing of Ralph L. Lape, Jr., but that you may have been involved in the disposal of the body and/or other evidence, as well as some use of Mr. Lape's ATM card or other assets. The promises I am making you are based upon the fact that you were not involved in the killing. If it turns out that you were the killer, all deals would be off.

I promise that if you give a full and complete detailed written and taped statement as to everything you know about the killing of Ralph L. Lape, Jr., and the disposal of his body, and the disposal of his truck and/or other evidence, and if you help the officers recover the body and any other evidence of which you are aware, I agree that the only crime I will charge you with is the class A misdemeanor of tampering with evidence. The maximum punishment for the misdemeanor of tampering with evidence is one year in the county jail. I would further agree that you would not be sentenced until after the trial(s) of the person or persons who committed the murder, so that the judge who de-

cides what amount of county jail time you would receive, if any, would know all about your full cooperation with the police and the prosecution.

It is absolutely imperative that you tell the investigators the complete truth now, because a prosecutor cannot use perjured testimony. Everything you tell us now must be the complete and detailed truth. I cannot have you tell us something now and then find out later you were lying. If you lie to us now, this deal would be off.

I appreciate your willingness to tell the complete truth and you have my word that I will honor the promises made in this letter.

[Signed by H. Morley Swingle, Prosecuting Attorney]

To restate the bargain, the prosecutor agreed to charge Appellant with a class A misdemeanor if Appellant was not involved in the killing of Victim but was only involved in the disposal of the body or other evidence and used Victim's ATM card or other assets. Furthermore, Appellant agreed to give a "full and complete detailed written and taped statement" as to everything Appellant knew about the killing and disposal of Victim's body. The prosecutor reiterated at the end of the letter, after a discussion of the necessity of telling the complete truth and perjured testimony, "[i]f you lie to us now, this deal would be off." The issues are whether Appellant was involved in the killing of Victim or whether Appellant lied to the police subsequent to the signing of the deal. The answer is "yes" to both questions.

Appellant did not simply dispose of Victim's body; he was there and participated when Victim was killed. Prior to the murder, Gill came to Appellant and said he wanted to get Victim, "tape him up," take him out to the country, and shoot him.

Appellant went to the store and bought duct tape to use in the crime. When Victim entered his own home, Appellant helped bind Victim with pull ties or zip ties. Appellant knew Victim was alive on the trip to the country as he could see his stomach moving up and down and he then participated in digging Victim's grave. Clearly, Appellant was a participant in the murder of Victim.

Additionally, Appellant lied to the prosecutor in his first statement after the deal was struck. Appellant first said that Gill had come to Appellant's house and said he needed help getting rid of a body and threatened to kill him if he did not help. He claimed that Gill already had Victim tied up in the truck and that he had never met Victim. In his second statement, he admitted that his prior statement did not include all the facts and he had not told the complete truth. At that time he said that both he and Gill were having money troubles. That is when he admitted that Gill had come to him with the murder plan. He claimed he was "sketchy" about the plan at first but then said all right. The second statement was when he admitted that he had bought the duct tape and was present during the entire murder.

▪▪▪ The due process clause forbids convictions based in whole or in part on an involuntary confession. *State v. Clements,* 789 S.W.2d 101, 105 (Mo.App. S.D.1990). "The test for voluntariness is whether, under the totality of the circumstances, the defendant was deprived of free choice to admit, to deny, or to refuse to answer and whether physical or psychological coercion was of such a degree that defendant's will was overborne at the time he confessed." *State v. Rousan,* 961 S.W.2d 831, 845 (Mo. banc 1998). We review the trial court's findings, however, to determine whether substantial evidence supports the trial court ruling. *State v. Vinson,* 854 S.W.2d

615, 621 (Mo.App. S.D.1993). In determining the sufficiency of the evidence, the facts and reasonable inferences are taken in the light most favorable to the order challenged on appeal. *State v. Blair*, 691 S.W.2d 259, 260 (Mo. banc 1985). We are not left with a definite and firm belief that a mistake has been made. *See State v. Eshnaur*, 106 S.W.3d 571, 574 (Mo.App. W.D.2003). We find substantial evidence supports the trial court in that there was no coercion in the proffer of leniency and there is no allegation that the interviews were coerced in any other way.

At the time of the negotiations, neither the prosecutor nor the police knew to what extent Appellant was involved, if at all, in the murder of Victim. The letter and the conversations were clear that Appellant must not have been involved in the actual murder of Victim and that he had to be truthful. He was neither. Only Appellant knew to what extent he was involved. He was given full warning in the *Miranda* warnings and by the prosecutor's letter that his statements would be used against him and he would be charged with murder if he was involved in the actual murder or if he lied in his statement to the police. Point II is denied.

### POINT III

 Appellant claims in his third point of error that the trial court erred in submitting an instruction which attributed the conduct element of shooting Victim to Appellant *or* Gill and instructed the jury that Appellant "acted together with" Gill. Specifically, Appellant is arguing that "if conduct elements are committed entirely by another person, all elements [should] be ascribed to that person, not the defendant" and the jury should be instructed to determine whether the defendant "aided or encouraged" that other person and not "acted together with" the person. Appellant mistakenly relies on the "fact" that was

introduced into evidence that Gill pulled the trigger. Simply pulling the trigger is not the only conduct element in this particular first-degree murder case. The use of the disjunctive with regard to the criminal actor and the use of the instruction "acted together with" both turn on an analysis of the evidence relating to the conduct elements of the crime, so they will be examined together.

The use of a disjunctive instruction, and the use of the "acted together with" instruction, has been previously addressed by this Court in *State v. Purl*, 236 S.W.3d 680 (Mo.App. S.D.2007):

> A person is criminally responsible for the conduct of another when "he aids or agrees to aid or attempts to aid such other person in planning, committing or attempting to commit the offense." Section 562.041.1(2). "The central tenet of accomplice liability is the notion that all who act together 'with a common intent and purpose' in committing a crime are equally guilty." *State v. Biggs*, 170 S.W.3d 498, 504 (Mo.App. W.D.2005) (quoting *State v. Copeland*, 928 S.W.2d 828, 847 (Mo. banc 1996)). Instructions made in the disjunctive are often used in cases of accomplice liability because as MAI–CR 3d 304.04 Notes on Use 4, has noted "[t]here are almost an infinite number of variations in factual situations of accessorial liability." . . . Instructions must be supported by substantial evidence and reasonable inferences to be drawn therefrom. *State v. Howard*, 896 S.W.2d 471, 492 (Mo.App. S.D.1995). Clearly, disjunctive submissions of alternative means by which a single crime can be committed is proper only if the alternative submissions are each supported by the evidence. *Puig*, 37 S.W.3d at 377.

*Id.* at 685.

The instructions in this case were based on MAI–CR3d 304.04 and the Note on Use

5(b). These sources indicate that when the defendant and another person are joint actors in committing the conduct of an offense, the elements in the verdict director may be ascribed to the defendant alone, to both the defendant and the other person, or to the defendant or the other person. Note 5(b) also gives directions on selecting the "acted together with" language. This Court determined that acting together with "means that the Defendant by his own acts committed some or all of the conduct elements of the offense." *Puig*, 37 S.W.3d at 377. Further, under this Court's analysis in *Purl*, we determined that in order to support an "acted together with" instruction the defendant must complete essential conduct in the underlying crime. *Purl*, 236 S.W.3d at 687; *see generally Puig*, 37 S.W.3d at 377 (where this Court found the defendant did not commit a conduct element of the crime when he was already present at a location before the crime took place and did not provide conduct essential to the completion of the crime); *but see Biggs*, 170 S.W.3d at 504–05 (where the defendant was found to have provided a conduct element after he provided the weapon for the robbery and drove the get-away car).

Therefore, the jury instruction given in this case is appropriate if the evidence supports a finding that Appellant and Gill were joint actors, meaning that there is evidence to support each of the alternative theories that Gill or Appellant committed the conduct acts and the evidence is clear that Appellant committed at least some conduct elements of the offense.

Appellant argues that the disjunctive instruction is in error because the only evidence presented at trial indicates that Gill was the shooter. There are more conduct elements in a murder than simply pulling the trigger. Appellant heard and concurred in the plan to murder Victim prior to the murder. Appellant bought the duct tape. Appellant was present when Victim was bound; apparently, there was a struggle at that time because of the other injuries on Victim indicating there was plenty of time to deliberate on the crime. Victim was still alive on the way to the country, which allowed more time for deliberation. Appellant was present at the scene of the actual pulling of the trigger. Under our *Purl* analysis, he acted together with Gill even if he did not physically pull the trigger. Factually, it is clear that Appellant committed a conduct element of the crime.

Furthermore, it was appropriate to submit the verdict directors in the disjunctive because the evidence was not clear as to all conduct elements of the crime. Appellant is incorrect that the only evidence regarding the shooting was that Gill did it. Appellant made several statements to police, at one time denying any role in the murder itself. Appellant later admitted that he rode with Gill to dispose of Victim's body and, finally, in a fourth statement to police, Appellant admitted all of his participation in the murder. Although in each of these statements Appellant denied being the shooter, the statements were inconsistent overall. Each of these inconsistent statements was presented at trial, which brought his credibility in issue, and, as a result, the jury could not be bound by Appellant's claim that it was undisputed that Gill was the shooter or the prosecutor's statements that Appellant was not the shooter. *See State v. Gill*, 167 S.W.3d 184, 191 (Mo. banc 2005) (where Gill claimed Appellant was the shooter, the court found the self-serving and inconsistent statements of the defendant, combined with Gill's extensive admitted involvement in the murder, supported a jury instruction indicating the evidence was unclear). Victim also had additional injuries that were not explained by Appellant at all. Appellant provided many accounts of

the crime; it was up to the jury to determine which were true. Since the evidence presented supports each of the alternative theories presented by the disjunctive instruction, it was appropriate to present the instruction in the disjunctive.

 We find that the verdict director on first-degree murder, which was modeled after MAI–CR3d 304.04 and Note 5(b), was the proper MAI instruction and was supported by the evidence. Our review of Appellant's claim of insufficient evidence to support the given instruction is limited to determining whether sufficient evidence was admitted at trial from which a reasonable trier of fact could have found each element of the offense to have been established beyond a reasonable doubt. *State v. Chavez,* 128 S.W.3d 569, 573 (Mo. App. W.D.2004). We do not reweigh the evidence, but determine if the conviction is supported by sufficient evidence. *State v. Mann,* 129 S.W.3d 462, 467 (Mo.App. S.D. 2004). Point III is denied.

### POINT IV

 Appellant claims prosecutorial misconduct in questions and comments during voir dire, opening statement, and closing argument. Appellant argues that the prosecutor's "repeated, intentional misconduct violated [Appellant's] state and federal constitutional rights to due process, a fair trial, reliable sentencing and freedom from cruel and unusual punishment." The State alleges that Appellant raises at least four different types of alleged prosecutorial misconduct and the point is not properly presented for appeal. Although, arguably, each of the claimed misconduct by the prosecutor should be analyzed under a different standard of review and should be the subject of a separate point of review, Appellant lumps them

together as a pattern of misconduct and then states the trial court should have *sua sponte* declared a mistrial. The State is correct that Appellant's brief violates Rule 84.04 [6] by raising multifarious claims. We shall review Appellant's claims for plain error only.

The first claimed misconduct is the reference to "they" when referring to the shooting of Victim in both opening statement and closing argument. Appellant argues that it was undisputed that the shooter was Gill. He claims the argument that the jury could consider as evidence that Appellant deliberated, that Appellant and Gill had "armed themselves with guns," and that Gill had gotten Victim's bank PIN number before his mouth was taped was improper.

The second claimed misconduct was the prosecutor using a chart, denominated "deliberation," that purported to set forth the applicable law and facts. Appellant claims the chart improperly advised the jury to consider as evidence of Appellant's deliberation the actions of Gill. Among the factors that the prosecutor asked the jury to consider were actions, including lies, told after the murder to show deliberation. Appellant claims that telling the jury that actions taken after the killing constitute deliberation misleads them and lessens the State's burden of proof on that essential element of the offense.

Finally, Appellant claims that the prosecutor acted improperly when he supposedly "bent over, and like he was kneeling down on the floor" when describing the trajectory of the gunshot wound as being consistent with someone who is kneeling down in a grave while someone above is firing a gunshot down. Appellant claims that the prosecutor acting out what happened turned himself into an unsworn wit-

---

**6.** All rule references are to Missouri Court Rules (2007), unless otherwise specified.

ness, who was not subject to cross-examination and encouraged the jury to put themselves in Victim's position of kneeling down prior to being shot.[7]

 Prosecutorial misconduct is unconstitutional when it so infects the trial with unfairness as to make the resulting conviction a denial of due process. *Donnelly v. De Christoforo*, 416 U.S. 637, 642–43, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Argument may not be so outrageous as to violate due process and the Eighth Amendment. *Newlon v. Armontrout*, 885 F.2d 1328, 1337 (8th Cir.1989). We find, when reviewing the specified incidents, either individually or cumulatively, that there is no constitutional violation and Appellant was not deprived of a fair trial.

 We note that any alleged misconduct, alone, does not warrant reversal of an otherwise valid conviction. *U.S. v. Young*, 470 U.S. 1, 11, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). Even conduct that is "undesirable or even universally condemned" does not warrant reversal unless it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). "The trial court has considerable discretion in allowing argument of counsel, and the rulings are reversible only for abuse of discretion where argument is plainly unwarranted." *State v. Weaver*, 912 S.W.2d 499, 512 (Mo. banc 1995). Given the broad discretion the trial court has regarding comments during the opening statement and closing arguments, we find no error in overruling an objection to the plural pronoun in describing the actions that led to the murder of Victim. Clearly, the State's position was that both Gill and Appellant participated in the murder of Victim. Even Appellant used the plural pronoun, "we," when describing various actions taken during the crime. He said "we pull tied him up and duct taped him and put him in, inside the truck." He then added "We leave. We leave. We get on ... 55 south and we proceed down ... to Portageville" and "we digging a hole." He further contended that "we cut, cut all the duct tape, the clothes, shoes ... off and put it all in a bag" after Victim was shot.

As for the deliberation chart, the prosecutor argued facts that he believed supported an inference of deliberation. He tried to tie together the participant's motive for the murder of lack of money to the behavior after the death in spending the money, hiding the weapons and other evidence and lying about what had occurred. Even the claimed physical actions of the prosecutor mimicked the actions shown in Appellant's confession video. We find none of Appellant's complaints about the prosecutor's conduct are valid nor rise to the level of prosecutorial misconduct. We are not left with any conviction that Appellant was deprived of a fair trial. Point IV is denied.

## POINT V

 Appellant's final complaint is that an African–American venireman was excused for hardship when he stated that he had been on pain medications for two years, had had eight ankle surgeries, and had a doctor's appointment for surgery the following Monday of trial. Appellant contends that the venireman agreed that he could concentrate and listen to the evidence and his pain level and condition

---

7. Appellant also argues that the prosecutor injected facts that were not in evidence into his closing argument by referencing a comparison to Jesse James. Appellant did not object to the comment nor include it in his point relied on, therefore, we will not address it.

would not worsen were he to delay his doctor's appointment.

We review the trial court's action for an abuse of discretion. *State v. Zink,* 181 S.W.3d 66, 73 (Mo. banc 2005). In the process of asking the venire about any serious hardships, venireman Roosevelt Williams stated he was scheduled for ankle fusion surgery the following Monday and he could not be re-scheduled for another three months. He stated he is always in pain, despite taking the pain medications. Despite Appellant's claims that the venireman was not an appropriate person for a hardship determination, we shall defer to the trial judge, who was able to observe the venireman and hear his responses. Point V is denied.

The conviction is affirmed.

LYNCH, C.J., and SWEENEY, SR.J., concur.