**STATE of Missouri, Plaintiff–Respondent,**

v.

**Stephan GALBREATH, Defendant–Appellant.**

No. 27902.

Missouri Court of Appeals, Southern District, Division Two.

Jan. 30, 2008.

Margaret M. Johnson, Columbia, MO, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., and Joshua N. Corman, Assistant Attorney

General, Jefferson City, MO, for Respondent.

GARY W. LYNCH, Chief Judge.

Stephan Galbreath ("Defendant") was charged by amended information as a prior and persistent offender and found guilty by a jury of committing the class A felony of assault in the first degree, in violation of section 565.050;[1] the class B felony of burglary in the first degree, in violation of section 569.160; the class D felony of unlawful use of a weapon, in violation of section 571.030;[2] and the unclassified felony of armed criminal action, in violation of section 571.015.[3] Defendant was sentenced as a dangerous offender under section 558.016[4] to life in prison on the first-degree assault charge, thirty years in prison on the first-degree burglary charge, five years in prison on the unlawful use of a weapon charge, and two hundred years in prison on the armed criminal action charge. Defendant appeals, contending the trial court erred in submitting jury instructions on each count which instructed the jury in the disjunctive to find Defendant guilty if they found that he "acted together with or aided" another in committing the offenses. Defendant argues that a jury instruction containing alternate theories in the disjunctive can only be submitted when there is substantial evidence to support each theory, and there was no evidence that Defendant acted together with another to commit any "conduct elements" of the offenses. We find that the instructions were erroneous because they did not follow the Notes On Use for the applicable Missouri Approved Instruction. However, because we find no prejudice to

Defendant resulting from the submission of the instructions, we affirm.

### Factual Background

Defendant does not challenge the sufficiency of the evidence to support his convictions. Viewing the evidence in the light most favorable to the convictions, *State v. Fitzpatrick*, 193 S.W.3d 280, 283 (Mo.App. 2006), the facts are as follows:

In 2004, Defendant was the most notorious cocaine dealer in Osage Beach and the surrounding area. Around November of that year, he permitted a dealer who sold cocaine for him, named Robert "Boo" Jones ("Boo"), to front an ounce of cocaine to Michael Young ("Young"). Young agreed to sell the cocaine for Boo and pay him back later, but instead he "wound up doing it all" himself. Boo called Young for a couple of weeks trying to collect the $1,000.00 Young owed him for the cocaine, but Young continued to evade him. Defendant wanted his money, so he ordered Boo to go with him to Young's house "to make an example out of him." Defendant got very angry when Young said he did not have the money and ordered Boo to "do something" about it. Boo hit Young several times in the jaw while Defendant yelled, "Is that all he's going to get? You need to hit him one more time." When Boo finally stopped hitting Young, the men ordered Young to get in the car and told him that he wasn't going to leave their sight until they got their money. They drove him to Boo's house, where Young was not free to leave. Defendant told Young he better call some people and try to get the money. Young called several people, but could not

---

1. All references to statutes are to RSMo 2000, unless otherwise noted.

2. Section 571.030, RSMo Cum.Supp.2003.

3. An additional charge of the class A felony of kidnapping, in violation of section 565.110, was severed from the other four charges on the morning of trial.

4. Section 558.016, RSMo Cum.Supp.2003.

get a hold of anyone because it was so late at night.

Young spent the night at Boo's house, and the next morning recommenced his efforts to raise money by calling several people. He called his ex-girlfriend ("Victim") [5] several times. She kept refusing to help him, telling him she didn't have any money. That afternoon, there were several people over at Boo's house. Defendant took his .38 revolver and fired a shot into the floor near the head of a drug dealer who was sleeping on the floor. The dealer jumped up, thinking that Defendant had shot Young, and saw Defendant standing next to him laughing with the .38 revolver in his hand. Young got very scared, and called Victim again. He told her that he thought Defendant and Boo might be planning on killing him, and whispered to her that he was scared and wanted her to call the police. She offered to get him $400.00. Defendant agreed to let Young go if he gave him the $400.00.

That evening, Defendant, Boo, and Young met Victim at a nearby Wal–Mart parking lot. Victim gave Boo the $400.00 then went inside the store with Young. She told Young that she had called the police and they were waiting all around the parking lot. Young got angry at her for calling the police, because of what Defendant might do to him or Victim for being a "snitch". Defendant always made it known to everyone that snitches would be killed. After leaving the parking lot, Defendant and Boo were pulled over by the police and arrested for kidnapping.[6] Within a few days, both of them had posted bond and were released from jail.

About three weeks later, on the evening of December 28, 2004, Defendant called his girlfriend, Kristina Jones ("Jones"), and told her to come pick him up at his house. Defendant would frequently call Jones and have her pick him up and drive him to Jefferson City, where they would usually hang out with Defendant's friends at a billiards hall named "Mike's Corner Pocket" and sometimes spend the night in a motel. Jones always drove, and Defendant would tell her where to go. Defendant never wanted anything in his name and always made Jones register the motel rooms under her name. He also had her register a cell phone for him under her name.

On the evening of December 28, Jones arrived at Defendant's house around eight-thirty. Defendant and another man came out of the house and approached her car. The second man was dressed all in black, with a hooded sweatshirt drawn tight around his face. Although she had seen him many times before and knew him well, it took Jones a few seconds to recognize the man as Defendant's best friend, Darrell Turner ("Turner"). Defendant and Turner got into Jones' white Acura, and Defendant told her to "[d]rive." When she got to the intersection where they would normally turn right to go to Jefferson City, Defendant told her to turn left toward Osage Beach. She was surprised and asked him where they were going, and he told her, "Don't worry about it." Defendant then told her to turn onto Horseshoe Bend Parkway. Jones was growing uneasy because they had never gone this way before, and Defendant had never had someone in the car dressed so strangely. She asked Defendant again where they were going, and he said, "We are just going to scare somebody . . . no big deal, don't worry about it." Defendant contin-

---

**5.** In order to protect the identity of Victim and her family we will refer to her family members only by their first names.

**6.** The kidnapping charge, as noted in footnote 3, was severed from and not tried in this case.

ued ordering Jones where to turn until they finally ended up in a circle drive at the end of Cornett Branch Road. Jones circled around, and Defendant told her to "keep driving." She drove back up Cornett Branch Road the way she had come, and Defendant told her to stop in front of a wooded area. Defendant asked Turner, "Is this good?" and Turner got out of the car. Defendant told Jones to drive, and she continued driving back up Cornett Branch Road.

Defendant directed Jones to a nearby convenience store named LaFatta's, where he went inside and bought a drink. Jones kept asking Defendant what was going on, and he kept telling her not to worry about it. Defendant then directed Jones to an apartment building back in the area near Cornett Branch Road, and had her pull into a parking space and stop. Defendant was speaking calmly with someone on his cell phone, asking, "What's going on? What can you see? How are you doing? How's everything going?" After sitting in the parking lot for awhile, Defendant said, "Let's go," and Jones drove.

Defendant directed Jones to drive back toward Cornett Branch Road. On the way, he told her he wanted her to go knock on a door and ask for "Tammy Franklin." Jones had never before heard that name and did not know anyone by that name. She knew she had to do what Defendant wanted, because she was too afraid of what he would do to her if she said no. Defendant directed Jones to a house on Cornett Branch Road, right before the wooded area where they had dropped off Turner. The house was Victim's, although Jones had no idea whose house it was, or who Victim was. Jones pulled into the driveway in front of the garage, next to three other cars that were parked in the driveway. She got out of the car, and Defendant got into the back seat. Jones knocked on the front door, and Victim's brother, Marcus, answered the door. Jones asked Marcus if "Tammy Franklin" was there, and he said he had no idea who she was talking about. Then Victim came to the door, and Jones also asked her if "Tammy Franklin" was there. Victim said, "No, you might want to try the next house down." As Jones was walking away, Victim's cat ran out the door, and Marcus chased it down. He noticed Jones' white, two-door car in the driveway, which he thought was either an Acura or a Honda. Marcus took the cat back inside and Jones got back into her car.

Defendant asked Jones, "Well?" She replied that they told her Tammy wasn't there. Defendant asked, "Was she bigger?" Jones asked, "The girl?" Defendant said, "Yes, was she bigger?" Jones replied, "Yes." Defendant said, "All right, let's go," and he directed her back to LaFatta's. He had Jones park in a small parking lot along the side of LaFatta's, where he made a call on his cell phone. Jones heard him say, "What's going on? Where are you at? What can you see?" He then told Jones to "just drive," and she drove to a nearby mini-mart where she used the bathroom. Jones again asked Defendant what was going on, and he told her not to worry about it.

Defendant then ordered Jones to drive back toward Cornett Branch Road. Defendant was attempting to make phone calls along the way, and by the time they arrived at the wooded area where Turner had gotten out of the car, Defendant was "freaking out" because he couldn't get a hold of whomever he was trying to call.

On December 28, 2004, Victim was hanging out at home with her brother Marcus and her niece and nephew, Rachel and Daniel, when Jones knocked on her door. Shortly after Jones left, Marcus left to go buy some cigarettes at LaFatta's. As he

was driving up Cornett Branch Road toward LaFatta's, he saw the white Acura or Honda that he had seen earlier in the driveway pass by him heading the opposite direction. Not long after Marcus left the house, Daniel decided to leave, and Victim walked him to the door. When Daniel opened the front door, he saw a man standing in front of him pointing a gun at him—a black revolver—about a foot from his face. The man was wearing a dark hooded sweatshirt pulled tight around his face. The man instructed Daniel to lie on the ground, and he obeyed. Victim was standing behind Daniel when she saw the man at the door pointing a gun at Daniel's face. She said to him, "What do you want? Do you want money?" The man asked, "Are you [Victim]?" She replied, "No, I'm her sister." Victim thought the man was there to kill her because she had called the police on Defendant and Boo, and she thought she might be able to trick the man into thinking she was someone else. The man told her to "[g]et on the floor" and asked if there were any other people there. Victim told him Rachel was in the kitchen, but did not get on the floor right away in an attempt to stall him. Rachel came out into the entrance where the man could see her, and he instructed her and Daniel to lie down on the floor in the kitchen. He then ordered Victim to get on the floor in the kitchen doorway, and she did.

Next the man called someone on his cell phone. He said into the phone, "I don't know if it's her." He then asked the person on the other end to "[d]escribe [Victim]" and "asked if she was a bigger girl." Then he said, "Yeah, it's her." He told the person, "There's kids here," and the person on the other end said, "Kill them all." The man hung up the phone and yelled at Victim, "Are you trying to play me? Are you trying to play me?" Daniel then heard two gunshots. About thirty seconds later, he and Rachel ran into the garage, and Daniel called 9-1-1 from his cell phone. The next thing Victim remembered was waking up in the hospital on January 21, 2005.

Meanwhile, while Defendant was "freaking out" in the car, Jones had circled around the drive, and they were sitting in front of the wooded area, headed back up Cornett Branch Road. About thirty seconds later, Defendant connected with the person he was trying to call. Jones heard Defendant say, "You're in, you're in," and then, "Her name is [Victim] and she is kind of bigger." Then he said, "There's kids in there," and told the person to kill them all. Defendant's window was down just a little bit, and Jones heard a gunshot. Defendant yelled, "Go!" and Jones sped up the road. As they passed Victim's house, Turner came running out of the house still dressed all in black with the hooded sweatshirt pulled tight around his face. Defendant yelled to Jones, "Stop!" and Turner got into the car. Both Defendant and Turner yelled at her, "Go!" and then Defendant looked at his cell phone and said, "11:06, I need to be made public."

As Jones sped away, Defendant asked Turner what had happened in Victim's house. Turner said, "Two shots to the head, she's dead." Turner told him there were kids in the house and that he had put them in a room across from the refrigerator. Defendant wanted to know if the kids had seen anything, and Turner replied, "No, everything is fine. This isn't anything to me, this is like nothing new to me." The two then discussed whether to return to Defendant's house in Osage Beach or to go to Jefferson City, and Defendant directed Jones to drive to Jefferson City. As Jones drove on highway 54 toward Jefferson City, both Defendant and Turner yelled at her for speeding. They

also discussed what they were going to do with the gun.

Defendant directed Jones to drive to a duplex in a residential neighborhood. Turner went inside the duplex and came back out wearing jeans and a t-shirt; his black clothing was gone. Defendant then directed Jones to drive them to Mike's Corner Pocket. He told her to park by the back entrance along the alleyway. Defendant and Turner had decided to put the gun in the dumpster behind "Hollywood," which was next to Mike's Corner Pocket.[7] Defendant and Jones got out of the car, while Turner was in the back seat "doing something with a plastic bag and newspapers[.]" Then Defendant and Jones went inside Mike's Corner Pocket and Turner walked down the alleyway. Defendant got some balls and played pool by himself in the middle of the bar, which was more visible than his usual table. Eventually Turner came inside and joined them. Defendant made a phone call, then handed Jones his pool cue and said, "I'll be right back, don't go anywhere." He and Turner left out the front door, and Defendant returned about ten minutes later. When the bar called "last call" twenty minutes later, Defendant said, "We're going," and Jones followed him up to the bar. Defendant told the bartender "he had a little bit of trouble at the lake" and needed a receipt for his pool time. It was not normal practice at the bar to give out receipts, so the bartender handwrote one on a piece of paper. Defendant paid for four hours of pool time, even though he had only been there for about an hour.

Thereafter, Defendant and Jones went to a hotel. Defendant handed Jones some cash and told her to go inside and get a room. While Jones was inside registering the room in her name like usual, Defen-

dant came in and said, "We have to change it. The room has to be in my name." Defendant signed a new registration form, then he and Jones went to the room. Throughout most of the night, Defendant sat in a chair making calls on his cell phone. The next morning, Jones drove them back to Osage Beach and dropped Defendant off at his house. As he was getting out of the car, Defendant handed Jones the cell phone which he had made her take out in her name, and said, "You've had this for a few days." Jones looked at him strangely, and he said, "Yes." Jones did not see Defendant again after that.

Victim suffered a gunshot wound to the left side of her head in the temporal area—just above her hairline. There was black powder burn around the gunshot wound, indicating that she had been shot at close range. The bullet had traveled through her left and right frontal lobes and remained behind her right eye. The frontal lobes control abstract thought, emotions, and speech. Victim has a permanent speech defect, and the bullet remains in her head, because it would be too dangerous to remove. Dr. Brent Miedema, the trauma surgeon who treated Victim, stated that in his twenty-two years of experience as a trauma surgeon, he had never seen a gunshot wound like Victim's not result in a fatality.

Detectives investigating Victim's shooting recovered a bullet from underneath Victim's house after noticing a small hole in a pool of blood on the kitchen floor. They also recovered a bullet from underneath Boo's trailer home. The Missouri Highway Patrol crime lab examined the bullets and determined that everything between the two bullets was consistent, and

---

7. The dumpsters behind Mike's Corner Pocket and Hollywood are emptied daily. Although

investigators searched every dumpster in the alleyway, they were not able to find the gun.

there were no dissimilarities, indicating that both bullets could have been fired from the same gun.

Defendant was charged, tried and sentenced as previously noted. This appeal followed.

### Standard of Review

Defendant concedes that his claims of error were not preserved for appellate review, because defense counsel did not timely object to the submission of the jury instructions at issue in accordance with Rule 28.03.[8] Therefore, our review, if any, is for plain error. Rule 30.20; *State v. Wurtzberger*, 40 S.W.3d 893, 897–98 (Mo. banc 2001).

Rule 30.20 provides that claims of error affecting substantial rights, even if not preserved for review, may be considered by this court "when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." The decision to grant plain error review lies within the reviewing court's discretion. *State v. Tabor*, 193 S.W.3d 873, 878 (Mo.App.2006). Plain error review involves a two-step analysis. *State v. Golden*, 221 S.W.3d 444, 447 (Mo.App.2007). First, we determine whether the claim of error facially establishes substantial grounds for believing that manifest injustice or miscarriage of justice has resulted. *Id.* "Plain errors are evident, obvious, and clear, and we determine whether such errors exist based on the facts and circumstances of each case." *State v. Johnson*, 182 S.W.3d 667, 670 (Mo. App.2005). Absent a finding of facial error, this court should decline its discretion to review the claim pursuant to Rule 30.20. *Golden*, 221 S.W.3d at 447. "If plain error is found, we proceed to the second step to consider whether the error actually resulted in manifest injustice or a miscarriage of justice." *State v. Stallings*, 158 S.W.3d 310, 315–16 (Mo.App.2005).

If timely objection is made to a court's failure to give a required instruction, or to give it in accordance with an accompanying Note On Use, the failure is presumed prejudicial, and the State has the burden to show otherwise. *State v. Westfall*, 75 S.W.3d 278, 284 (Mo. banc 2002); *State v. Goucher*, 111 S.W.3d 915, 918–19 (Mo.App.2003). However, this presumption of prejudice disappears if review is waived per Rule 28.03 due to lack of a timely objection. *Goucher*, 111 S.W.3d at 919 (citing *State v. Derenzy*, 89 S.W.3d 472, 475 (Mo. banc 2002)). When a defendant does not object to the error in giving the instruction, the burden shifts to him to show plain error resulted from the error. *State v. Thomas*, 75 S.W.3d 788, 791 (Mo. App.2002). In order to prove plain error, the defendant must show the trial court so misdirected or failed to instruct the jury as to cause manifest injustice or miscarriage of justice. *State v. Cooper*, 215 S.W.3d 123, 125 (Mo. banc 2007). "It must be apparent to the appellate court that the instructional error affected the jury's verdict." *Id.* "In determining whether the misdirection likely affected the jury's verdict, an appellate court will be more inclined to reverse in cases where the erroneous instruction 'did not merely allow a wrong word or some other ambiguity to exist, [but] excused the State from its burden of proof on [a] contested element of the crime.'" *State v. Roe*, 6 S.W.3d 411, 415 (Mo.App.1999) (quoting *State v. Doolittle*, 896 S.W.2d 27, 30 (Mo. banc 1995)). In addition, defense counsel's failure to object to a deviation from a Note On Use is a factor to be considered in determining prejudice. *State v. Livingston*, 801 S.W.2d 344, 348–49 (Mo. banc 1990); *State v.*

---

8. We note that Defendant's appellate counsel is not the same attorney who represented him at trial. All references to rules are to Missouri Court Rules (2006).

*Green,* 812 S.W.2d 779, 787 (Mo.App.1991). It is a relevant factor to consider, because if the defect in modifying the instruction "is not readily apparent to alert counsel preparing to argue the case, there is very little likelihood the jury will be confused or misled." *Id.*

### Discussion

Defendant raises three points on appeal. Point I challenges the verdict directing instructions on first-degree assault and armed criminal action (Instructions 6 and 12); Point II challenges the verdict directing instruction on first-degree burglary (Instruction 8); Point III challenges the verdict directing instruction on unlawful use of a weapon (Instruction 10). All of the instructions at issue were patterned after MAI–CR3d 304.04, which is to be used when the State's theory of guilt relies on "aider" liability under section 562.041.[9] MAI–CR3d 304.04, Note On Use 2. After setting forth the elements of the respective offense, each instruction included the following paragraph:

> . . . that with the purpose of promoting or furthering the commission of that [offense], the defendant *acted together with or aided* Darrell L. Turner in committing the offense[.]

(Emphasis added).

Defendant claims that each verdict director has the same instructional defect.

Defendant argues that because an instruction which submits alternative methods of committing a crime in the disjunctive can only be submitted when the evidence supports each alternative, the trial court plainly erred in submitting an instruction with the language "acted together with or aided," in that the evidence did not show that Defendant acted together with Turner in committing any of the conduct elements of the offenses. Defendant relies on *State v. Puig,* 37 S.W.3d 373, 377 (Mo.App.2001), for the proposition that an instruction using the language "acted together with or aided" must be supported by evidence that the defendant himself committed some or all of the conduct elements of the offense, in order to support the "acted together with" alternative. Defendant asserts that Turner committed all of the conduct elements of the offenses, and "the sole basis for his liability was his aid to [Turner] by being the lookout or driver of the getaway car." Therefore, he argues, according to MAI–CR3d 304.04 Note On Use 5(a), the instruction should have stated that Defendant "aided or encouraged" Turner in committing the offense.[10] Defendant asserts that the use of the wrong variation of MAI–CR3d 304.04—"acted together with or aided"—when it was unsupported by the evidence was prejudicial to his defense because the instructions and the State's

---

9. The instruction for armed criminal action was additionally patterned after MAI–CR3d 332.02.1.

10. MAI–CR3d 304.04 Notes On Use 5(a) reads in relevant part:

 **(a) Where the conduct elements are committed entirely by another person or persons.**

 Where the evidence shows the conduct elements of the offense were committed entirely by someone other than the defendant and the sole basis for defendant's liability is his aiding the other person or persons (as where the defendant is not present but

planned the offense, or where the defendant is the lookout or driver of the getaway car in a robbery or burglary), the defendant will usually be charged with the same offense and the same degree of the offense as the other person. In such cases,

(1) all of the elements of the offense, including the culpable mental state, should be ascribed to the other person or persons and not to the defendant, and

(2) select the alternative "aided or encouraged" in the paragraph following "then you are instructed that the offense of [*name of offense* ] has occurred[.]"

argument referencing them "were both misleading" and created the possibility of conviction without a unanimous jury.

Because Defendant makes exactly the same argument under each point, save for the elements of the respective offenses, we will consider all three of the points together.

### Verdict Directors Failed to Follow Note On Use 5(a)

■ Under a theory of aider liability, a defendant is guilty of an offense committed by another person when the defendant is criminally responsible for that person's conduct. Section 562.036. The relevant portion of section 562.041 states:

A person is criminally responsible for the conduct of another when

. . . .

(2) Either before or during the commission of an offense with the purpose of promoting the commission of an offense, he aids or agrees to aid or attempts to aid such other person in planning, committing or attempting to commit the offense.

When the State bases its theory of a defendant's guilt on aider liability under this statute, as in this case, the jury instructions must be patterned after MAI–CR3d 304.04. Rule 28.02(c); MAI–CR3d 304.04, Note On Use 2. The failure to give an instruction in accordance with any applicable Notes On Use constitutes error, the prejudicial effect of such error to be judicially determined. Rule 28.02(f); *State v. Caldwell*, 956 S.W.2d 265, 267 (Mo. banc 1997).

MAI–CR3d 304.04 Note On Use 3 states that the introductory paragraph to the instruction should always read:

A person is responsible for his own conduct and he is also responsible for the conduct of (another person) (other persons) in committing an offense if he acts with the other person(s) with the common purpose of committing that offense or if, for the purpose of committing that offense, he aids or encourages the other person(s) in committing it.

When, however, all verdict directing instructions submitted to the jury are based on aider liability this paragraph is to be deleted from the separate verdict directing instructions and instead given as a separate instruction, as was done correctly in this case.

Note On Use 5 to MAI–CR3d 304.04 directs how to modify the instruction in order to appropriately impute another person's conduct to the defendant. This modification consists of two steps. First, the paragraphs following the introduction should set out the elements of the offense, including the culpable mental state, in numbered paragraphs according to the ordinary verdict directing instruction applicable for that offense. However, the elements should be modified to attribute each one to the defendant or the other person as supported by the evidence. Second, the paragraph following the element paragraphs should set out the basis whereby the defendant is responsible for the conduct of the other person. Note On Use 5 provides three options for describing the defendant's aider conduct which include "acted together with," "aided or encouraged," and "acted together with or aided." Subsections (a) through (c) direct which option is to be used in each given scenario.[11]

---

11. A fourth subsection, 5(d), describes the situation where the defendant is personally responsible for all conduct elements of the offense and another person was involved. 5(d), which is scarcely used, does not follow the same rules of modification as (a) through (c) and is inapplicable to this case.

In this case, every verdict directing instruction at issue attributed the conduct elements of the offenses entirely to Turner.[12] Subsection (a) of Note On Use 5

**12.** Instruction 6 read, in part:

> As to Count Two, if you find and believe from the evidence beyond a reasonable doubt:
>
> First, that on or about December 28, 2004, in the County of Camden, State of Missouri, Darrell L. Turner knowingly caused serious physical injury to [Victim] by shooting her,

then you are instructed that the offense of assault in the first degree has occurred, and if you further find and believe from the evidence beyond a reasonable doubt:

> Second, that with the purpose of promoting or furthering the commission of that assault in the first degree, the defendant acted together with or aided Darrell L. Turner in committing the offense,

then you will find the defendant guilty under Count Two of assault in the first degree.... Instruction 8 read, in part:

> As to Count Three, if you find and believe from the evidence beyond a reasonable doubt:
>
> First, that on or about December 28, 2004, in the County of Camden, State of Missouri, Darrell L. Turner knowingly entered unlawfully in an inhabitable structure located at [address] and owned or possessed by [Victim], and Second, that Darrell L. Turner did so for the purpose of committing the crime of assault in the first degree therein, and Third, that while Darrell L. Turner was in the inhabitable structure he caused immediate physical injury to [Victim], and that [Victim] was not a participant in the crime,

then you are instructed that the offense of burglary in the first degree has occurred, and if you further find and believe from the evidence beyond a reasonable doubt:

> Fourth, that with the purpose of promoting or furthering the commission of that burglary in the first degree, the defendant acted together with or aided Darrell L. Turner in committing the offense,

then you will find the defendant guilty under Count Three of burglary in the first degree.... Instruction 10 read in part:

> As to Count Four, if you find and believe from the evidence beyond a reasonable doubt:
>
> First, that on or about December 28, 2004, in the county of Camden, State of Missouri, Darrell L. Turner exhibited in the presence of one or more persons a revolver type handgun, and
>
> Second, that he did so in a threatening manner, and
>
> Third, that the revolver type handgun was readily capable of lethal use, and
>
> Fourth, that Darrell L. Turner acted knowingly with respect to the facts and conduct submitted in this instruction,

then you are instructed that the offense of unlawful use of a weapon has occurred, and if you further find and believe from the evidence beyond a reasonable doubt:

> Fifth, that with the purpose of promoting or furthering the commission of that unlawful use of a weapon, the defendant acted together with or aided Darrell L. Turner in committing the offense,

then you will find the defendant guilty under Count Four of unlawful use of a weapon. Instruction 12 read, in part:

> As to Count Five, if you find and believe from the evidence beyond a reasonable doubt:
>
> First, that defendant is guilty of the offense of assault in the first degree, as submitted in Instruction No. 6, and
>
> Second, that Darrell L. Turner committed that offense with the use of a deadly weapon,

then you are instructed that the offense of armed criminal action has occurred, and if you further find and believe from the evidence beyond a reasonable doubt:

> Third, that with the purpose of promoting or furthering the commission of that armed criminal action, the defendant acted together with or aided Darrell L. Turner in committing that offense,

then you will find the defendant guilty under Count Five of armed criminal action.... Thus, the instant case, as well as *Puig*, 37 S.W.3d 373; *Biggs*, 170 S.W.3d 498 (Mo.App. 2005); and *Purl*, 236 S.W.3d 680 (Mo.App. 2007), differ from those cases where a conduct element is ascribed to defendant or the other person in the disjunctive and the defendant claims that submission as to his conduct is not supported by the evidence. *See,* e.g., *State v. Gill*, 167 S.W.3d 184 (Mo. banc 2005); *State v. Brown*, 2008 WL 44335, 246 S.W.3d 519 (Mo.App.2008).

states that when the conduct elements—as opposed to the intent element—of the offense were committed entirely by a person other than the defendant, "all of the elements of the offense, including the culpable mental state, should be ascribed to the other person or persons and not to the defendant." Subsection (a) further directs that the alternative "aided or encouraged" is to be selected to describe the defendant's conduct in aiding the other person. However, in this case, the instructions used the alternative "acted together with or aided" to describe Defendant's conduct. According to Note On Use 5, "acted together with or aided" may be used only when at least one of the conduct elements is ascribed to the defendant under subsections (b) and (c) of the note. But when all of the conduct elements are attributed to the other person, subsection (a) applies and requires that the alternative "aided or encouraged" be selected to describe the defendant's conduct in aiding the other person.

The State concedes and we find that the use of "acted together with or aided" instead of "aided or encouraged" did not comply with Note On Use 5(a) and constitutes instructional error. As such, Defendant has satisfied the first step of plain error review—the claim of error facially establishes substantial grounds for believing that manifest injustice or miscarriage of justice could have resulted. *Golden*, 221 S.W.3d at 447. The State argues, however, that Defendant has failed to meet his burden of proving that the errors so misdirected or failed to instruct the jury that it is apparent the errors affected the jury's verdict and resulted in manifest injustice or miscarriage of justice.

### No Manifest Injustice or Miscarriage of Justice

 Defendant's argument that the instructional error "clearly confused the jury" is based solely on the proposition from *Puig, supra,* that the submission of "acted together with" in an instruction must be supported by evidence that the defendant by his own acts committed some or all of the conduct elements of the offense.

In *Puig,* undercover officers went to the home of Hans Anderson to purchase marijuana. 37 S.W.3d at 374. Anderson agreed to sell them a quarter of an ounce of marijuana, and Puig was present throughout the negotiations. *Id.* Anderson directed Puig to retrieve his scale out of Puig's pickup truck so that he could measure the appropriate amount of marijuana. *Id.* Puig went outside and retrieved the scale from his truck and brought it inside to Anderson. *Id.* Anderson measured out the appropriate amount of marijuana and completed the sale. *Id.* at 374–75. A jury found Puig guilty of sale of a controlled substance, in violation of section 195.211. *Id.* at 374. Although Puig was charged as a principal, the verdict directing instruction used at trial ascribed the conduct elements of the offense to Anderson and ascribed Puig's liability for that conduct based on a theory of aider liability, submitting that Puig "acted together with or aided" Anderson in making the sale. *Id.* at 376. In response to Puig's challenge to the sufficiency of the evidence to support his conviction, this court found sufficient evidence Puig aided Anderson in making the sale in that Puig "encouraged the sale by providing an instrument necessary to complete the transaction." *Id.* at 376. However, citing to the Notes On Use from MAI–CR3d 304.04, we found instructional error in the submission of "acted together with" because the evidence did not support that Puig by his own acts committed any of the conduct elements of the offense, in that he did not (1) transfer the marijuana, or (2) receive any consideration. *Id.* at

377. We further found that the instructional error prejudiced Puig in that "the prosecutor's argument, *without evidentiary support,* had the effect of misleading the jury." *Id.* at 378 (emphasis added). The prosecutor specifically referred to the "acted together with or aided" language from the instruction and repeatedly argued to the jury that Puig "acted together with" Anderson because he urged the undercover officers to buy the marijuana from Anderson. *Id.* However, the record was completely devoid of any evidence that Puig urged the officers to purchase as the prosecutor suggested. *Id.* Consequently, some jurors may have relied on the prosecutor's argument which was unsupported by the evidence and decided Puig's guilt based on an unsupported theory of "acted together with," while not considering at all whether he "aided" Anderson. *Id.* Therefore, we found that Puig was prejudiced by the erroneous instruction in combination with the prosecutor's misleading argument which was unsupported by the evidence, and reversed and remanded the case for a new trial. *Id.*

■ Defendant argues that according to *Puig,* prejudice resulted from submitting that he "acted together with" Turner in committing the offenses, because some of the jurors may have believed Defendant "aided" Turner while others may have believed he "acted together with" Turner when there was no evidence that Defendant committed any of the conduct elements of the offenses. Defendant's argument confuses the instructional error analysis in *Puig* with its prejudice analysis. Cases subsequent to *Puig* have also grappled with interpreting our decision in

that case. *See State v. Purl,* 236 S.W.3d 680 (Mo.App.2007); *State v. Biggs,* 170 S.W.3d 498 (Mo.App.2005).[13] We believe that the difficulty in interpreting *Puig* lies with our failure in that case to explicitly point out that the instruction was erroneous in the first instance, whether it was supported by the evidence or not, because it failed to comply with Note on Use 5(a).

In *Puig,* we cited the discussion from MAI–CR3d 304.04, Note On Use 4, that "acted jointly with another person" means the defendant "by his own acts committed some or all of the conduct elements of the offense." 37 S.W.3d at 377. This definition, like all other guidelines under the Notes On Use, must be followed when modifying the MAI instruction. Rule 28.02(f). Accordingly, we found instructional error in submitting "acting together with" because Puig did not transfer the marijuana or receive any consideration, thus the instruction was not in compliance with Note On Use 4 because he did not commit the conduct elements of the offense. *Puig,* 37 S.W.3d at 377–78. The opinion in *Puig,* however, failed to point out that the instruction also failed to comply with Note on Use 5(a). The instruction in *Puig* was deficient, as was the instruction in this case as previously discussed *infra,* because none of the conduct elements as set forth in the instruction were ascribed to the defendant, yet "acted together with or aided" was used instead of "aided or encouraged," as mandated by Note on Use 5(a). *See Id.* at 376–77; discussion on failure to follow Note on Use 5(a), *infra;* MAI–CR3d 304.04 Note on Use 5(a). The use of the phrase "acted

---

13. *Puig* involved the review of preserved error, while *Purl, Biggs,* and the instant case are reviewed for plain error. However, a determination of manifest injustice or miscarriage of justice is a "benchmark higher than that required for a showing of mere prejudice."

*State v. Tripp,* 168 S.W.3d 667, 671 (Mo.App. 2005). Thus, a finding of a lack of prejudice *ipso facto* is a finding of a lack of manifest injustice or miscarriage of justice. *Blackmon v. State,* 168 S.W.3d 129, 134 (Mo.App.2005).

together with or aided" in the verdict directing instruction in *Puig* and the case at bar was in contravention of Note on Use 5(a) and, therefore, erroneous regardless of whether it was supported by the evidence or not. MAI–CR3d 304.04 Note on Use 5(a). Thus, the discussion in *Puig* as to whether "acted together with" as used in the instruction was supported by the evidence was unnecessary to the conclusion that the instruction was erroneous, because, regardless of the evidence, the instruction in and of itself was erroneous for not complying with the mandates of Note on Use 5(a).

Therefore, the key to understanding *Puig* lies in separating the prejudice analysis from the review for instructional error according to the rules from the Notes On Use in MAI–CR3d 304.04. The rules and definitions from the Notes On Use are to be followed in modifying the instruction and submitting it to the jury, but they have little, if any, bearing on analyzing the effect of an erroneous instruction on a jury in the context of aider liability.[14] *See* Rule 28.02(f) ("the error's prejudicial effect [is] to be judicially determined"); *Biggs*, 170 S.W.3d at 504 (applying disjunctive submission rule "to an instruction on accomplice liability is uniquely problematic"). An ordinary juror has no understanding of the legal principles underlying "elements" of a crime such as "conduct elements" or "intent elements." Thus, MAI–CR3d 304.04 provides modification terms like "aided or encouraged," "acted together with," or "acted together with or aided" so

that the jury can more easily understand the defendant's conduct as it fits within aider liability.

In analyzing whether erroneously used words in an instruction affected the jury's verdict, *Cooper*, 215 S.W.3d at 125, we look at how a reasonable juror would interpret the words used, and typically will not reverse when the word is merely ambiguous and does not excuse the State from its burden of proof on an element of the offense. *State v. White*, 92 S.W.3d 183, 192 (Mo.App.2002). The concern in *Puig* was that the prosecutor in his closing argument defined "acted together with" for the jury as meaning Puig's conduct in urging the officers to purchase marijuana from Anderson, when there was no evidence in the record supporting that Puig did in fact urge the officers to purchase marijuana. 37 S.W.3d at 377–78. Thus, there was no evidence to support the definition of "acted together with" as provided by the prosecutor to the jury, and if the jury relied on that definition in deciding Puig's guilt without considering whether he "aided" Anderson, the State was essentially relieved of its burden of proof on aider liability. *Id.* at 378. The "acting together with" language was therefore prejudicial because there was no evidence to support the definition which the prosecutor ascribed to it.

Because we found sufficient evidence that Puig "aided" Anderson to support his conviction, our finding of prejudice compelling the reversal of his conviction was nec-

---

**14.** Section 562.041 proscribes only one type of conduct: "aid." The phrase "acted together with or aided" is logically inconsistent in that "or" typically joints two mutually exclusive concepts, yet "acted together with" is necessarily subsumed within "aided." If it was not, the conduct of "acting together with" would not be criminal under section 562.041. Because "aid" remains undefined in the statute and is the only proscribed con-

duct, it becomes clear that the phrases provided by MAI–CR3d 304.04 are simply different ways of describing "aid" for the jury, and cannot be mutually exclusive terms. Accordingly, the Notes on Use directing the specific phrasing of the instruction to be submitted are not necessarily helpful to a prejudice analysis when determining whether the jury was misled as to whether a defendant "aided" under the statute.

essarily based on something other than the fact that Puig did not commit any of the conduct elements of the offense. Otherwise, we would be placing a heavier burden of proof on the State than section 562.041 requires. Therefore, it is clear the prejudice was caused by the prosecutor's erroneous and misleading definition of "acted together with" which was not supported by the evidence. *Puig* should not be read more broadly than necessary to explain its prejudice analysis.

In this case, like in *Puig*, we find instructional error due to the State's failure to follow the Notes On Use for MAI–CR3d 304.04, albeit the specific Notes on Use relied upon differ. Nevertheless, in order to prove the error constitutes plain error Defendant must show the trial court so misdirected or failed to instruct the jury as to cause manifest injustice or a miscarriage of justice, and it must be apparent to this court that the error affected the jury's verdict. *Cooper*, 215 S.W.3d at 125. Defendant's reliance on *Puig* in proving prejudice is unavailing because the facts from *Puig* are distinguishable from this case. In this case the prosecutor did not argue to the jury a definition of "acted together with" that was unsupported by the evidence. Defendant claims the following portions of the prosecutor's closing argument confused the jury:

Instruction Number 5 is an instruction that applies to all of the other what we call verdict directors. . . . . The law or this instruction tells you that if somebody aids or encourages or is acting with someone else for the purpose of committing the offense, that they are just as responsible for the criminal act as is the person that performed the act or committed the act.

I want you to understand how that works and understand that's what we are—that's our theory in this case, is

that this defendant, Stephen Galbreath, acted together with Darrell Turner in assaulting [Victim] and committing the other crimes that were a part of that crime.

. . . .

[T]he very next instruction I would encourage you to turn to is Instruction Number 6. This is what we call the verdict director because, of course, it directs you to your verdict. And I will take just a minute to go through it, see that you understand how it works.

. . . .

Now, this is the way this instruction works in terms of accomplice liability. If you find all of those things [the elements] to be true, then the instruction tells you that you are instructed that the offense of assault in the first degree has occurred, and if you further find and believe from the evidence beyond a reasonable doubt, then the rest of the instruction says that, second, with the purpose of promoting or furthering the commission of that assault in the first degree, the defendant in this case, Stephen Galbreath, acted together with or aided Darrell Turner in committing that offense.

Then talk about that. Do you think that the evidence showed beyond a reasonable doubt that he either acted together with or aided Darrell Turner? If so, put "okay" by that or a checkmark and move on.

These remarks by the prosecutor were merely a recitation of the instructions to the jury and an explanation of how to follow them, step-by-step, in their deliberations. The prosecutor did not argue any specific evidence defining Defendant's conduct in "acting together with" Turner; he merely stated that the jury was to consider whether they believed Defendant acted together with Turner, according to the evi-

dence. Thus, the prosecutor's argument was not misleading like the argument in *Puig.*

In analyzing a reasonable juror's interpretation of "acted together with" in this case, we cannot say that the erroneous submission of that phrase to the jury so affected their verdict as to cause a manifest injustice or miscarriage of justice to Defendant. Unlike in *Puig*, the phrase was submitted undefined and left open to interpretation by the jury. It was an ambiguous term that did not excuse the State from its burden of proof on an element of the offense. *White*, 92 S.W.3d at 192.

The evidence showed that Defendant supplied Turner with the revolver used to shoot Victim, he directed and delivered Turner to Victim's house, he explained to Turner what victim looked like, he ordered Turner to kill Victim and her niece and nephew when Turner called Defendant from his cell phone, he provided the getaway car, and he fled with Turner from Victim's house after Turner shot her. The proximity of Defendant's conduct to Turner's commission of the offenses was so close that Defendant's conduct could accurately be described as essential to the completion of the crimes. *See State v. Purl*, 236 S.W.3d 680, 687 (Mo.App.2007) (defendant agreed to provide drugs to an informant, put the informant in contact with the dealer and accompanied the dealer to sell the drugs to the informant, which constituted "essential conduct" to support the "acted with" portion of the verdict directing instruction for possession of a controlled substance with intent to deliver); *State v. Biggs*, 170 S.W.3d 498, 505 (Mo.App.2005) (defendant provided "essential conduct" for the successful completion of a robbery by providing a firearm to his son when his son was robbing a convenience store and driving the "get away" vehicle to escape the crime scene).

We have no doubt that based upon this evidence a juror could reasonably conclude that Defendant "acted together with" Turner in committing the offenses. Defense counsel's failure to object to the instruction buttresses our conclusion that the language was not misleading or confusing. *Livingston*, 801 S.W.2d at 348–49; *Green*, 812 S.W.2d at 787.

Defendant has failed to show how the claimed errors affected the jury's verdict resulting in a manifest injustice or miscarriage of justice. Therefore, the trial court did not commit plain error in submitting the instructions. All three points are denied.

### Decision

The trial court's judgment is affirmed.

RAHMEYER, J., and BURRELL, J., concur.